UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CHARLETHA B. MIDDLETON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 16-1596 (EGS) |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) | |
| Defendant. | ) ) | |

## **MEMORANDUM OPINION**

Charletha B. Middleton ("plaintiff") challenges the decision of the Acting Commissioner of Social Security ("SSA") to deny her application for period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, *see* 42 U.S.C. §§ 401-33. This matter is before the Court on plaintiff's Motion for Judgment of Reversal and the SSA's Motion for Judgment of Affirmance. For the reasons discussed below, the Court denies the former and grants the latter.

I. BACKGROUND

A. Procedural History

Plaintiff submitted an application for DIB on January 11, 2013. (A.R. 168-74.)[1] At that time, she was 36 years of age. (A.R. 70.) According to plaintiff, she became disabled on May 3,

---

[1] The Court refers to the Administrative Record ("A.R."), ECF No. 11, according to the page numbers designated by SSA.

1

2012, (A.R.168), because of the condition of her neck, shoulder, arm, hand and leg, and the resulting pain she experiences, (A.R. 204). SSA denied her application on March 29, 2013. (A.R. 93-96). Plaintiff sought reconsideration of the decision, (A.R. 97), without success, as the SSA found "that the previous determination . . . was proper under the law," (A.R. 98). On August 5, 2013, plaintiff requested, (A.R. 107-08), and SSA scheduled, (A.R. 133-37), a hearing before an administrative law judge ("ALJ"). The hearing took place on May 13, 2015. Plaintiff, who then was represented by counsel, testified at the hearing, as did an impartial vocational expert. (A.R. 40-69). The record remained open for 14 days after the hearing in order that plaintiff submit updated treatment records; plaintiff filed none. (A.R. 22).

The ALJ issued his decision on June 25, 2015 that plaintiff is not disabled and, therefore, is not entitled to period of disability or disability insurance benefits. (A.R. 33). On July 5, 2015, plaintiff sought review of the ALJ's decision. (A.R. 14-15). The Appeals Council denied the request on July 16, 2016. (A.R. 1-6).

B. Medical Records

According to plaintiff, she has "endured [her] condition since 2005." (Mot. for J. of Reversal at 1; A.R. 360). She reported that she has severe pain in her back, neck, right arm and right hand. (A.R. 212). Plaintiff underwent magnetic resonance imaging ("MRI") of the right shoulder in May 2012. (A.R. 441). The test revealed "[m]ild AC joint arthropathy," but "no significant tear of the rotator cuff or labrum," (A.R. 441), and was "[o]therwise [a] negative study." (A.R. 441; *see* A.R. 260). X-rays of plaintiff's cervical spine in May 2012 showed "[m]ild degenerative spondylosis and foraminal stenosis." (A.R. 440). An MRI of plaintiff's cervical spine in June 2012 showed "[d]egenerative disk spondylitic change with multilevel

neural foraminal encroachment," but "no spinal stenosis or cord compression." (A.R. 369; *see* A.R. 258).

In July and August 2012, plaintiff attended four sessions with a physical therapist. (A.R. 265). Eight sessions had been scheduled, yet plaintiff discharged herself and chose not to return after a fourth visit. (A.R. 264).

Plaintiff presented to Avery Healthcare Associates, PC, on January 30, 2013, complaining of neck, shoulder and back discomfort, and requested a referral for consultation with an orthopedic specialist. (A.R. 360). On March 13, 2013, Dr. Elliott Aleskow conducted a disability evaluation. (A.R. 306-14). Plaintiff complained of "pain radiat[ing] to the middle of her back and both shoulders," and stated she had not sustained a neck injury at any time. (A.R. 306). She required no assistive device; she could sit and stand 15-30 minutes; she could walk 4-5 blocks; she could travel without difficulty. (A.R. 306). In addition, plaintiff "was able to walk on heels and toes, squat rise from a squatting position and tandem walk without difficulty." (A.R. 307). The strength of her hand grip was normal bilaterally, and she "was able to do fine-motor skills without significant difficulty." (A.R. 307). According to Dr. Aleskow, plaintiff "had full range of motion of all extremities with the exception of the cervical spine region," and aside from this limited range of motion, plaintiff "appear[ed] to be stable medically" and without "any obvious neurological deficit[.]" (A.R. 307).

Plaintiff consulted with Dr. Damon Robinson, a pain management specialist, (A.R. 50), on June 7, 2013, complaining of "continuous, throbbing, aching, shooting and severe" pain that had begun seven years previously and gradually progressed. (A.R. 436). After conducting a physical examination, Dr. Robinson's "primary diagnosis [was] cervical radiculopathy secondary cervical disc displacement." (A.R. 437). Dr. Robinson conducted cervical examinations on July

3

5, 2013 (A.R. 433-34), July 26, 2013 (A.R. 430-31), September 25, 2013 (A.R. 421-22), October 25, 2013 (A.R. 418-19), November 11, 2013 (A.R. 415-16), November 27, 2013 (A.R. 411-12), May 5, 2014 (A.R. 404-05), September 9, 2014 (A.R. 401), October 7, 2014 (A.R. 397), November 21, 2014 (A.R. 392), and March 17, 2015 (A.R. 371). He reported nearly identical negative results from these examinations. Dr. Robinson conducted lumbar examinations on September 13, 2013 (A.R. 427), March 12, 2014 (A.R. 408-09), November 21, 2014 (A.R. 393), and March 17, 2015 (A.R. 371), and one thoracic examination on November 21, 2014, with negative results. (A.R. 393).

Dr. Robinson referred plaintiff to physical therapy on November 27, 2013. (A.R. 321). Plaintiff was considered "an excellent candidate for physical therapy intervention to decrease the pain in the arm and in the neck, teach proper posture and body mechanics, and overall therapeutic exercises to promote muscle strength and restore over all function." (A.R. 324). On February 19, 2014, plaintiff reported that her "pain condition [was] unchanged," (A.R. 342), and significant improvement with her range of motion and strength in her neck and shoulder, (A.R. 344). Her last appointment was February 25, 2014. (A.R. 348).

Plaintiff had an MRI of her cervical spine on November 7, 2015, (A.R. 10), which revealed "[m]ultilevel degenerative changes with severe left and moderate right neural foraminal narrowing at C4-C5, moderate to severe right and moderate left neural foraminal narrowing at C5-C6, and moderate left neural foraminal narrowing at C6-C7," (A.R. 11).

On April 6, 2016, plaintiff underwent an MRI of her lumbar spine, which revealed:

> Specific disc disease is as follows:
> L4-L5: There is a mild diffuse disc bulge and a moderate-sized central annular fissure. There is no significant spinal canal or neural foraminal narrowing.
> L5-S1: There is a mild diffuse disc bulge and a moderate-sized central annular fissure that contacts the descending S1 nerve roots.

4

> There is mild bilateral facet arthropathy resulting in mild bilateral neural foraminal narrowing. There is no significant spinal canal narrowing.
> The remainder of the vertebral levels are unremarkable with no evidence of significant spinal canal or neural foraminal narrowing.
> IMPRESSION:
> Mild diffuse disc bulges and moderate central annular fissures at L4-L5 and L5-S1 with abutment of the descending S2 nerve roots at L5-S1.

(A.R. 8).

### C. Plaintiff's Hearing Testimony

Plaintiff, a single woman, was 39 years of age at the time of her hearing. (A.R. 44). She lived in a house with her children (ages 25, 16 and 15) and visited with and occasionally cared for her grandson (age 4). (A.R. 45). She earned a Bachelor's degree in business administration with a concentration in human resources management. (A.R. 46). Her last paid work was as a recruiter at a nursing home ending in November 2011. (A.R. 46-47). She resigned from that position for non-medical reasons. (A.R. 47).[2] In prior years, plaintiff held another position as a recruiter, (A.R. 47), performed administrative work and also had been a bank teller and a money transfer representative. (A.R. 48-49; *see* A.R. 221-28). Since May 2012, plaintiff had not had paid work, had not applied for any jobs, and had not engaged in any volunteer activities. (A.R. 50).

Plaintiff testified that she experienced pain in her neck and back, received treatment from Dr. Robinson, a pain management specialist, and experienced significant relief from the pain medication he prescribed. (A.R. 50-51). Without medication, she rated her pain level as between eight and nine on a 10-point scale; with medication, she rated her pain level as three or

---

[2] Plaintiff "just had issues with the job." (A.R. 47). "There was theft going on in [her] office," and because she "didn't have management support," she "felt . . . it would be better if [she] resign[ed]." (A.R. 46). Elsewhere, plaintiff indicated that she "resigned from 'Recruitment' job for Hostile/Constructive Discharge work related reasons." (A.R. 14).

5

four. (A.R. 51). Side effects from the medications included drowsiness and blurred vision. (A.R. 52). She has had no surgeries to address her issues, and no surgery ever has been recommended. (A.R. 51-52).

According to plaintiff, she could walk a block or two, stand up for less than one hour, sit down for less than one hour, and lift no more than 10 pounds. (A.R. 52). However, plaintiff occasionally would lift her grandson, who weighed "maybe 30, 40 pounds." (A.R. 52). Plaintiff testified that she bathed herself, dressed herself, cooked, and shopped for groceries, and shared laundry and housecleaning duties with her children. (A.R. 54). She enjoyed baseball, fishing, plays, puzzles, and reading. (A.R. 54-58). Plaintiff had attended four baseball games the previous year and stayed for the entire games. (A.R. 56). She had gone fishing the previous summer and was able to cast a fishing rod. (A.R. 55). Plaintiff also explained that sitting, standing or cooking for longer periods of time was uncomfortable, and that she had difficulty with grocery shopping because lifting and carrying bags could be painful. (A.R. 59-60). When she would do something strenuous, she described the pain in her right arm as "shooting through [her] elbow and [going] through [her] wrists, through [her] fingers," and her "fingers get numb." (A.R. 62). Plaintiff also testified that she experiences pain in her right leg, her neck and her back, and her worst pain is in her neck and shoulders. (A.R. 63). She did not have any issues reaching overhead, however. (A.R. 63).

### D. Residual Functional Capacity Assessments

Dr. Esther Pinder, a State agency medical consultant, reviewed plaintiff's records and determined that plaintiff has a medically determinable severe impairment in the category Spine Disorders. (A.R. 73). However, in Dr. Pinder's view, "[t]he totality of medical evidence [did] not warrant a disabling impairment." (A.R. 74). Plaintiff could lift and/or carry 10 pounds

6

frequently, stand and/or walk six hours in an eight-hour work day, and sit for six hours in an eight-hour work day. (A.R. 74). In addition, plaintiff could climb stairs, balance, stoop, kneel, crouch and crawl, and she had no manipulative, visual, communicative, or environmental limitations. (A.R. 75). However, because of plaintiff's reduced range of motion, she should avoid ladders, ropes or scaffolds. (A.R. 75). And although plaintiff's conditions impose "some limitations in [her] ability to perform work related activities," Dr. Pinder concluded that "these limitations do not prevent [plaintiff] from performing work [she has] done in the past as a/an HR Assistant." (A.R. 77). Dr. Veronica Bedeau conducted an independent review of plaintiff's record and agreed with Dr. Pinder's conclusion. (A.R. 79-87).

E. Vocational Expert's Testimony

Ted D. Mitchell, a certified vocational evaluation specialist, (A.R. 64), classified plaintiff's past work experience as follows:

> [T]he claimant's past work experience as a personnel recruiter. It has a DOT code of 166.267-038. It has an exertional level of sedentary, and SVP of 7, which is a skilled position. She has experience as an administrative clerk. It has a DOT code of 219.368-010. It has an exertional level of light, and SVP 4, so it's semi-skilled. She has experience as a teller. It has a DOT code of 211.362-018. It has an exertional level of light, and a SVP of 5, so it's a skilled position. And she also has experience as a foreign bank code teller. It has a DOT code of 211.362-014. It has an exertional level of sedentary. It has a SVP of 5, so it's a skilled position[.]

(A.R. 65). The ALJ asked Dr. Mitchell if a hypothetical individual of plaintiff's age, with her education, work history, and physical limitations, could perform any of plaintiff's past work. (A.R. 65-66). Dr. Mitchell responded that this hypothetical individual "would be able to perform the job of personnel recruiter, and foreign banknote teller." (A.R. 66). In addition, Dr. Mitchell testified, this hypothetical individual would be able to perform the jobs of addressor, call out operator, and surveillance system monitor. (A.R. 66). These jobs are classified as sedentary and

7

unskilled. (A.R. 66). According to Dr. Mitchell, there were approximately 8,133 full time addressor employees, 8,089 full time call out operators, and 4,564 full time surveillance system employees in the nation. (A.R. 66).

## II. DISCUSSION

Judicial review in Social Security disability cases is limited to determining whether SSA's findings are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971). The substantial evidence test "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Florida Mun. Power Agency v. FERC*, 315 F.3d 362, 365-66 (D.C. Cir. 2003) (internal quotation omitted). The court lacks the authority to substitute its own judgment for that of SSA. *Chevalier v. Shalala*, 874 F. Supp. 2, 3 (D.D.C., 1994) (citing *Davis v. Heckler*, 566 F. Supp. 1193, 1195 (D.D.C. 1983)).

The Social Security Act defines the term "disabled" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A person is deemed disabled only if her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she} would be hired if [she] applied for work." 42 U.S.C. § 423(d)(2)(A). It is plaintiff's burden to prove that she is disabled, *see* 42 U.S.C. § 423(d)(5)(A),

and she may do so by providing evidence of her education and training, work experience, daily activities, and other information about how her impairment affects her ability to work, *see* 20 C.F.R. § 404.1512(a)(1).

SSA determines whether a person is disabled by a five-step sequential evaluation process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled[.]
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled[.]
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled[.]
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled[.]
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled[.]

20 C.F.R. § 404.1520(a)(4).

### Step One: Plaintiff Has Not Engaged in Substantial Gainful Activity Since the Purported Onset of her Disability.

The term "substantial gainful activity" means "work activity that involves doing significant physical or mental activities," 20 C.F.R. § 1572(a), and "gainful work activity" means "work activity [done] for pay or profit," 20 C.F.R. § 1572(b). Plaintiff testified that she last

9

worked in November 2011, when she resigned for non-medical reasons from her position as a recruiter at a nursing home. (A.R. 46-47). She had not engaged in any paid or volunteer activities, and had not applied for any jobs since May 2012. (A.R. 50). Thus, plaintiff established that she had not been engaged in substantial gainful activity since May 3, 2012, the alleged onset date of her disability. (A.R. 25).

### Step Two: Plaintiff Has Severe Medical Impairments.

If a claimant has no "impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities, [SSA] will find that [she does] not have a severe impairment and [is], therefore, not disabled." 20 C.F.R. § 1520(c).

The ALJ identified plaintiff's impairments as degenerative disc disease with radiculopathy, and arthropathies, and found that these impairments "significantly limit her ability to perform basic work activities." (A.R. 25.) Thus, plaintiff established that her medical impairments are severe.

### Step Three: Plaintiff's Impairments Do Not Meet the Severity of an Impairment Listed in Appendix 1.

"The Listing of Impairments," set forth in appendix 1, "describes for each of the major body systems impairments that [SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of . . . age, education, or work experience." 20 C.F.R. § 404.1525(a). If a claimant has "an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), [SSA] will find [her] disabled" 20 C.F.R. § 1520(d). However, if the claimant's "impairment(s) does not meet or equal a listed impairment, [SSA] will assess and make a finding about [her] residual functional capacity based on all the relevant medical and other evidence in [her] case record[.]" 20 C.F.R. § 1520(e). SSA "use[s its] residual functional capacity assessment at the fourth step of the sequential evaluation

10

process to determine if [the claimant] can do [her] past relevant work . . . and at the fifth step of the sequential evaluation process (if the evaluation proceeds to this step) to determine if [she] can adjust to other work[.]" *Id.*

The ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (A.R. 26). He found that plaintiff's record does not show a "major dysfunction of any joint resulting in an inability to ambulate effectively or the inability to perform fine and gross movements effectively," and she fails to meet the standard set forth in Medical Listing 1.02. (A.R. 26).[3] Nor does plaintiff's record show that her back and neck impairments meet the standard set forth in Medical Listing 1.04, which "requires compromise of a nerve root or the spinal cord, in addition to evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication." (A.R. 26).[4]

---

[3] Medical Listing 1.02 reads:
1.02 *Major dysfunction of a joint(s) (due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
B. Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

[4] Medical Listing 1.04 reads:
1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Reviewing plaintiff's medical evidence, the ALJ noted that, notwithstanding the pain plaintiff allegedly suffered, she experienced relief from medication, she could lift her grandson, undergo physical therapy, maintain an exercise routine, and reach her arms overhead. (A.R. 27). MRIs confirmed degenerative disc disease and mild abnormalities in plaintiff's right shoulder, yet other medical records "described few other abnormal findings despite [plaintiff's] continued complaints of pain." (A.R. 27). The ALJ noted the "conservative course of treatment" plaintiff received and that this "treatment . . . appeared to be effective." (A.R. 28). He deemed her "statements concerning the intensity, persistence and limiting effects of [her] symptoms . . . not entirely credible." (A.R. 27). Plaintiff maintained full strength in her upper extremities (A.R. 30), and physical therapy not only improved range of motion in her neck and shoulder, but also provided some relief from her neck pain. (A.R. 28). None of plaintiff's treating doctors "opined that [plaintiff] was disabled," and the ALJ gave significant weight to the conclusions of Dr. Pinder and Dr. Bedeau. (A.R. 30). Dr. Aleskow conducted "a thorough examination" of plaintiff, yet "[a]part from her limited range of motion in her cervical spine, [she] was stable medically. (A.R. 29). And plaintiff's own testimony "support[ed] the finding . . . that she could lift and/or carry ten pounds, stand and/or walk for six hours, sit for six hours, and perform occasional postural activities." (A.R. 29). Specifically, the ALJ noted plaintiff's ability to care for herself, cook, clean, shop for groceries, go fishing, attend baseball games, take public transportation, and lift her 30 or 40 pound grandson. (A.R. 29).

### Step Four: Plaintiff Can Perform Past Relevant Work.

Where, as here, SSA has not decided that plaintiff is disabled at one of the first three steps of this sequential evaluation process, it "consider[s the claimant's] residual functional capacity together with [her] vocational background." 20 C.F.R. § 404.1560(a). First, SSA

"compare[s its] assessment of [the claimant's] residual functional capacity with the physical and mental demands of [her] past relevant work." 20 C.F.R. § 404.1560(b). "Past relevant work" means work a claimant has "done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [her] to learn to do it." 20 C.F.R. § 404.1560(b)(1); *see* 20 C.F.R. § 404.1565(a) ("Work [a claimant has] already been able to do shows the kind of work that [she] may be expected to do."). If SSA determines that the claimant has "the residual functional capacity to do [her] past relevant work, [SSA] will determine that [she] can still do [her] past work and [is] not disabled," without considering "vocational factors of age, education, and work experience or whether [the claimant's] past relevant work exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(b)(3); *see* 20 C.F.R. § 404.1520(f).

The ALJ found that plaintiff's past relevant work as a recruiter, a money transfer representative, and a foreign bank teller was performed within the past 15 years for the requisite duration and for compensation. (A.R. 30-31). Further, "[i]n comparing [plaintiff's] residual functional capacity with the physical and mental demands of this work," the ALJ found that plaintiff "is able to perform it as generally performed." (A.R. 31). The vocational expert testified that someone with plaintiff's residual functional capacity would be able to perform the work plaintiff performed as a personnel recruiter and foreign bank teller. (A.R. 31).

<u>Step Five: Plaintiff Can Make an Adjustment to Other Work</u>.

If a claimant can make an adjustment to other work, SSA will find that she is not disabled. 20 C.F.R. § 404.1520(g). SSA is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [her] residual functional capacity and vocational factors," in order to support the conclusion that the claimant is not disabled at this fifth step. 20 C.F.R. §

404.1560(c)(2). Vocational factors include a claimant's age, *see* 20 C.F.R. § 404.1563, education and ability to communicate in English, *see* 20 C.F.R. § 404.1564, and work experience, *see* 20 C.F.R. § 404.1565.

The ALJ found that, "[a]lthough [plaintiff] is capable of performing past relevant work, there are other jobs existing in the national economy that she is also able to perform." (A.R. 31). He then made "alternative findings for step five of the sequential evaluation process," taking into consideration plaintiff's age, education, work experience, and residual functional capacity, and consulting to the Medical-Vocational Guidelines, *see* 20 C.F.R. Part 404, Subpart P, Appendix 2. Ordinarily, if a claimant "had the residual functional capacity to perform the full range of sedentary work, a finding of 'not disabled' would be directed by Medical-Vocational Rules 201.28 and 202.21[.]" (A.R. 32). This plaintiff's "ability to perform all or substantially of the requirements of [sedentary] work has been impeded by additional limitations," however. (A.R. 32). Based on the vocational expert's testimony, the ALJ determined that "an individual with [plaintiff's] age, education, work experience, and residual functional capacity . . . would be able to perform the requirements of [three] representative occupations: addresser . . . , call out operator . . . , and surveillance system monitor," all sedentary, unskilled jobs available in the national economy. (A.R. 32). Accordingly, the ALJ concluded, plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," such that "[a] finding of 'not disabled' is therefore appropriate[.]" (A.R. 32).

Plaintiff deems SSA's decision "unfair" because she purports to "have a chronic neck and back condition (bulging discs and degenerative discs) that does not allow [her] to live" as she once did "prior to [her] condition getting worse in 2012." (Compl. at 2 (page number designated by ECF)). She claims she cannot engage in activities such as household chores, sitting, standing

14

or walking because they not only "increase[her] pain significantly," but also "prohibit[] [her] from working a full time job[.]" (Mot. for J. of Reversal at 2 (page number designated by ECF)). Her challenge to the ALJ's Decision boils down to her own assessment of her condition, its purported date of onset, and its supposed effects on daily living and ability to work. (*See, e.g.,* Compl. at 2; Pl.'s Opp'n to Def.'s Mot. for J. of Affirmance & Mot. for J. of Reversal at 8-9). She refers to additional medical information she submitted in 2016, (Compl. at 2; Mot. for J. of Reversal at 2 (page number designated by ECF)), but these documents are not relevant. This Court's review is limited to the record before the ALJ, and these documents pertain to examinations conducted in April 2016 and November 2015, (A.R. 8-11), months after the ALJ issued his Decision on June 25, 2015.

The Court concurs with the ALJ's determination. It remains plaintiff's burden to demonstrate disability, and nothing in her complaint, motion for judgment of reversal or opposition to SSA's motion for judgment of affirmance undermines the ALJ's findings.

### III. CONCLUSION

Having reviewed the administrative record, the parties' cross-motions and oppositions thereto, the Court concludes that SSA's decision is supported by substantial evidence. Accordingly, the Court grants SSA's motion for summary affirmance and denies plaintiff's motion for judgment of reversal. An Order is issued separately.

DATE: March 13\_, 2018                    EMMET G. SULLIVAN
                                          United States District Judge